## Shirley *versus* Shirley.

| 59 | 267 |
|----|-----|
| 126 | 39 |
| 126 | 41 |
| 59 | 267 |
| 170 | 607 |
| 59 | 267 |
| 196 | 487 |
| 59 | 267 |
| 24 SC | '236 |

1. A father by writing *agreed to give* his sons his plantation, "to farm, likewise the horses, &c., to enable them to carry on farming" during his life; "to manage the same to the best advantage for themselves, to pay all taxes, &c. In consideration the sons "*agree to bind* themselves to keep the father and his wife, in every thing needful for their comfort, &c., during their lives, and pay the father's debts." *Held*, merely a contract to farm the land and maintain the parents, &c., the sons to be compensated by what they could make.

2. The instrument had nothing indicative of a present assurance; but was merely an agreement to be performed *in futuro*.

3. Courts should be slow to give effect as absolute conveyances to instru-

[Shirley *v.* Shirley.]

ments for provisions made between parents and children, unless the intention be very clear.

4. To obtain specific execution of such contract, the children must show that they have been ready, prompt and eager to perform their part of the contract.

5. It is always competent to prove what a party says against his interest about the matter in controversy.

October 28th 1868.   Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Indiana county :* Of October and November Term 1868, No. 133.

This was an action of ejectment for 180 acres of land in Conemaugh township, commenced January 2d 1865, by John Shirley and Thomas Shirley against Christopher Shirley.   Both parties claimed under Thomas Shirley, Sr.   On the trial before Campbell, P. J., of the 18th district, the plaintiffs gave in evidence articles of agreement dated December 21st 1852, between Thomas Shirley, Sr., and the plaintiff, by which "the said Thomas Shirley, Sr., agrees to give the said John and Thomas Shirley the farm I now live on to farm, likewise the horses and farming utensils to enable them to carry on farming said place for and during my natural life, and to have all the proceeds of the place or what they raise off it, and manage the same to the best advantage for themselves, to pay all taxes, and to have all they can make off it. Said Thomas Shirley, Sr., is to keep his stock of horses, cows and other animals usually kept on a farm, and the increase thereof (unless otherwise agreed upon), and said John and Thomas is to keep them in feed, fodder and pasture, and to have the use of them when not otherwise needed.

"In consideration whereof the said John and Thomas Shirley agree to bind themselves to keep the said Thomas Shirley, Sr., and his wife, their mother, in everything needful and necessary for their comfort and happiness in this life, for and during their natural lives, and likewise to pay all his just debts up to this time."

To this was added the following :—

"The parties in this article agree to have that part erased or annulled, that binds Thomas Shirley, Sr., to give the other party the use of his horses, but only when it suits him.   Which alteration each of the parties agree to, as witness our hands, this 1st day of September 1854."

The plaintiffs further gave evidence that after 1852 they carried on the farm.   Thomas being married, and living with his family in one part of the house, the father and mother in another ; the sons being in possession part of the time ; the old folks were well provided for, and were comfortable ; Thomas employed the hands on the farm, and attended to all matters about the farm ;

[Shirley *v.* Shirley.]

paid taxes and the debts of his father. John left in 1855 for Illinois, returned in 1856, and left early in 1857, and stayed away a year or more; Thomas left in the spring of 1860, in consequence of some disagreement with his father;—with other evidence for the purpose of showing the fulfilment of their covenants under the contract.

They then offered to prove that when Thomas left the possession of the land in the spring of 1860 he and his father agreed that his absence should be but for a short time, and that he would return when his father would become reconciled. And that Thomas at that time, in presence of his father, refused to give up his contract, and claimed possession of the land under it.

The offer was rejected, because there was no evidence that the agreement had been communicated to the defendant. A bill of exceptions was sealed for the plaintiffs.

They further gave evidence that Ezekiel Gray went into possession when Thomas left, occupying the same part of the house. John came back whilst Gray was in possession. Gray went out at the end of the year, and John remained in possession. It appeared also that afterwards an ejectment had been commenced by the defendant against John Shirley, in which he recovered the possession of the land.

The defendant gave in evidence articles of agreement between Thomas Shirley, Sr., and himself, dated August 24th 1860, for the property in dispute, in consideration that the defendant should keep his father and mother during their lives with food, raiment, &c., and pay the father $1500 in ten years,—possession to be given to him April 1st 1861.

Under objection by the plaintiffs and exception, John Lambton testified that when John was starting for the West, he told witness he had left enough behind him to square him if he did not happen to get back; he could not get along with Thomas; he would let him try it awhile himself; that he would not farm the place with Thomas, if he would give him the place and all he could make; he and Thomas could not agree.

The defendant further gave evidence for the purpose of showing that the plaintiffs had not complied with their covenants; that his father and others of the family had endeavored to persuade Thomas to stay, but he refused, went away, and never came back to work the place; that John said he was going to the West, and they might take all up that was there; he could make more money in the West. John went to the West in 1854, stayed about a year, came back, and farmed his father's place one season, went West again, returned to the neighborhood in about a year, got married, but did not farm the place till 1859. After Thomas left, Gray went there under a contract with the father to crop the place to the shares. John came back with the knowledge of Gray in October 1860; the father did not know he was coming; he came

[Shirley *v.* Shirley.]

late at night after the old man was in bed; the wagon containing
John's goods was left some distance from the house, and the
goods carried in quietly for fear of the old man, and put into the
end of the house in which Gray lived. Gray and John lived in
the house together till the next spring when Gray·left.

The plaintiff's points were:—

"1. The possession of the farm having been delivered under
the agreement of December 21st 1852, it was an executed con-
tract on the part of T. Shirley, Sr., and vested an estate in the
plaintiffs, which cannot be divested, nor the contract rescinded,
except by writing."

The court answered: "Possession of the land in dispute was
delivered to the plaintiffs in pursuance of the contract of 21st
December 1852, for the purpose of farming the same and using
the horses and farming utensils to enable them to carry on farm-
ing on said place during the life of their father Thomas Shirley,
Sr., the plaintiffs were to have all the proceeds of the place to
manage it for themselves. In consideration thereof, they were to,
pay all the taxes, to keep their father's stock of horses, cows and
other animals usually kept on a farm, and the increase thereof
in fodder, feed and pasture, &c., and to keep their father and
mother in everything needful for their comfort and happiness for
and during their lives, and to pay all the old man's debts up till
that date. We think this an executory contract, and so far as
determining it so we answer this point in the negative."

"2. If said contract is executory, to abrogate it by parol the
evidence must be clear, positive and satisfactory, and show a con-
tract of rescission, definite in its terms, conditions and limitations."

Answer: "We answer this point in the affirmative, but with-
out the rescission of the contract, how stood the parties? Old
Thomas Shirley was and is the holder of the legal title; his
sons, by the contract of 1852, have the right of farming the land
in dispute during his life. Granting all that is claimed under
this article, if the plaintiffs have failed to fulfil the covenants on
their part; if they have not paid their father's debts before that
date; if they have not paid the taxes; if they have not supported
the old people according to contract; and if one went to the West
stating that the farm might go to the devil, and the other refused
absolutely to stay and farm the place, and the old man had to
find another to farm the place, and provide him with the means
of living; can these plaintiffs, if the jury believe that they have
failed to fulfil the stipulations of the covenants on their part, càn
they enforce the equities which they held against the legal title
of the old man? can they enforce their equitable title or estate
against the legal estate or title without first doing equity? We
think and reinstruct you that they cannot. The old man or his
vendee is seeking nothing in this court. If the plaintiffs who are
seeking to enforce their equity held by virtue of that contract,

[Shirley v. Shirley.]

well, gentlemen, we instruct you that they are entitled to enforce their contract, but they must do equity themselves before requiring the interposition of a court and jury. It is for you to say whether they have done so or not."

3. "The parol evidence on the part of defendant is not sufficiently clear, positive and satisfactory to rescind said agreement, and the plaintiffs are therefore entitled to recover."

Answer: "We answer this point in the affirmative, but it does not follow that the plaintiffs are entitled to recover."

4. "Thomas Shirley, the elder, cannot rescind the contract for non-performance, without first refunding or offering to refund the money plaintiffs expended in payment of his debts and in the maintenance of himself and wife, and thus place them in the same situation they occupied before the contract was made."

Answer: "We answer this point that it is not the old man that is here seeking a rescission, but if he was this point would be correct."

The verdict was for the defendant.

The plaintiffs having taken a writ of error, assigned for error the answers to their points and the decisions of the court as to the evidence.

*H. White* and *H. W. Weir* (with whom was *J. M. Thompson*), for plaintiffs in error.—Technical words are not necessary to constitute a writing an executed contract. The intention of the parties is to decide: Johnson *v.* McCue, 10 Casey 180; Stewart *v.* Lang, 1 Wright 201. It may be executed as to one although executory as to the other party: Nease's Appeal, 7 Casey 294; Grover *v.* McAnulty, 3 Wright 473; Bortz *v.* Bortz, 12 Id. 386. There was nothing more to be done by the old man, to make it executory: Gray *v.* Packer, 4 W. & S. 17; Cook *v.* Trimble, 9 Watts 15; Hiester *v.* Green, 12 Wright 96. Plaintiffs had a legal title and can be defeated only by such evidence as would induce a chancellor to grant an injunction: Williams *v.* Bentley, 3 Casey 300. To take a case out of the Statute of Frauds, the proof of the parol contract must be definite and unequivocal: Goucher *v.* Martin, 9 Watts 109; Cravener *v.* Bowser, 4 Barr 259. To rescind a contract the party rescinding must place the other in his former situation: Espy *v.* Anderson, 2 Harris 308.

*Stewart & Clarke* and *H. D. Foster*, for defendant in error.— The instrument calls itself "an agreement," which in common understanding differs from a present conveyance: Stewart *v.* Lang, 1 Wright 204.

The opinion of the court was delivered, November 16th 1868, by THOMPSON, C. J.—The instrument claimed by the plaintiffs in

this ejectment to be an executed conveyance by Thomas Shirley, Sr., to them of the land in controversy, during life, has neither form nor substance to give rise even to a suspicion that such was intended to be its effect. It is, in our opinion, simply a contract by which the latter were to farm the land, and furnish Thomas Shirley Sr. and wife with a comfortable maintenance on it during their lives, at their own house on it, and to provide feed, fodder and pasture for his cattle; and by way of compensation, they to have what they could make off it from year to year, over and above this charge, paying taxes, and the debts of their father due at the date of the agreement.

There is not a word in it indicative of, or by the force of which a present assurance is to be deduced; while, on the other hand, the parties have denominated it an "article of agreement;" and it contains covenants to be performed by both parties in future, and is signed by both. On the part of Thomas Shirley, Sr., it is set forth that he "agrees to give" to the parties of the second part, "the farm I now live on, to farm. Likewise, the horses and farming utensils, to enable them to carry on farming said farm, for and during my natural life." This was an agreement to be performed *in futuro* in relation to the farm, as certainly as it was in relation to the horses and farming utensils; and that the latter were not given absolutely no one will contend.

Indeed, the understanding in regard to these, the parties have clearly shown by their supplemental agreement of the 1st of September 1854, in which the original article was modified so that Thomas Shirley Sr. was to give to his sons "the use of his horses only when it suits him." The whole thing was a family arrangement. The father to let his sons work his farm, and use his personal property, and they to maintain him and his wife, and take care of his cattle, &c. Were this a contract between strangers, no one would think of calling it an executed contract. It is only because of a supposed intention to yield something to his sons that it is suspected to possess that character; but that is not sufficient as the foundation for a judicial determination upon the rights of the parties. The intent must appear in the instrument; but such intent does not so appear here. The cases cited of Williams *v.* Bentley, 3 Casey 294; Ogden *v.* Brown, 9 Id. 247; Grover *v.* McAnulty, 3 Wright 473; and Bortz *v.* Bortz, 12 Id. 382, give no countenance to the interpretation contended for in this contract; they all strongly support a different conclusion. There is no present consideration to support a present grant in the instrument; and neither a *habendum* nor *tenendum*, or equivalent expressions, to be found in it.

Strong, J., in his opinion in Ogden *v.* Brown, *supra*, uses a remark to elucidate the intent of the parties, which may with great propriety be used here for a like purpose. "The purpose

[Shirley v. Shirley.]

of the instrument," said he, "was so evidently to make provision for Mrs. Cranmer while she should live, it can hardly be presumed her intention was to part with her interest irrevocably without effectuating her purpose;" meaning by an absolute conveyance of it. The terms there were much more indicative of an intention to convey, than any in the instrument we are considering. They were, that she had "granted, bargained and conveyed," yet the manifest purpose of the instrument, together with the nature of the covenants in it, carried the construction that it was but an executory agreement.

Courts, in my opinion, should be slow to give the effect of absolute conveyances to instruments for provisions made between parents and children, of the kind of which we are speaking, unless the intention be very clear. Such agreements are usually fruitful sources of strife, litigation, and very often of great wrong to aged and feeble parents; and when held to be absolute conveyances, it puts them entirely at the mercy sometimes of unwilling, and often unkind offspring.

There is no security in a conveyance for such purposes, unless it be most distinctly and expressly so made to appear on its face: Green v. Heister, 12 Wright 96; Kouffelt v. Bowers, 7 S. & R. 64. If this were to be held a conveyance of a life estate to the sons as grantees, the grantor would be at their mercy, with no security for maintenance but their personal covenant. They might sell the estate, or it might be sold for their debts, and their parents be made to become a public charge, and the object of it entirely defeated. Happily, as already said, there are no words, provisions or intention, apparent in the agreement, requiring such a conclusion. It is clearly executory, and was properly so held by the court below. This assignment of error is, therefore, not sustained.

This being the state of the plaintiffs' title, they must rely on equitable principles to arrive at specific performance. They must do equity, or show that they have at all times been ready to do it; that they have been "ready, prompt and eager," to perform their part of the contract.

It is apparent from the testimony, that John Shirley, one of the plaintiffs, paid little if any attention to its performance. He went West within two or three years, to follow his occupation of carpenter, and was but little on the farm for several years; and then he got back into it by unlawful means, whilst another man was occupying as tenant of his father. It also appears that Thomas left, against the remonstrance of a sister and brother-in-law, and of his father, if the testimony be true. But a question is raised on an offer by the plaintiffs to prove, that when Thomas Shirley Jr. left the place in the spring of 1860, there was an understanding between him and his father, that his absence was not to be of

9 P. F. Smith—18

[Shirley *v.* Shirley.]

long continuance, and that "he would return when his father would become reconciled; and that Thomas at that time, in presence of his father, refused to give up his contract, but claimed possession of the land under it."

This was such an extraordinary proposition, that it might have been the shortest way to dispose of it to have admitted it. The idea that two men so much dissatisfied with each other, as to be obliged to separate, and yet agreeing to come together when one of them should become more placable, is certainly somewhat difficult to believe. Moreover, the claiming possession, while the alleged agreement rested upon its temporary surrender, was at best also an extraordinary proposition. I think testimony just to the effect of the offer, would not have been very hard for a jury to dispose of. But our duty is with the offer—to determine whether it was improperly rejected or not.

We must treat it as containing facts which could have been proved. Would they have availed anything of themselves, if admitted? There was no offer to follow them with anything else. What equity would there have arisen in favor of the plaintiffs if these facts had been proved, without proof that Thomas did come back according to agreement and offer performance? I cannot see any. He left in the spring of *1860*, and did not return, nor offer to return, until suit brought. John's clandestine entry would not avail to supply this requirement on his part. Indeed, that has been determined to be illegal by the record of the suit against him by his brother.

I would say, therefore, that if this secondary agreement had any virtue in it, it should have been shown to have been complied with. This not having been done, or offered to be shown, the testimony would have been without benefit to the plaintiffs, and the error, if any, in rejecting it, harmless.

But it seems to us the ground assumed by the learned judge for rejecting the offer was impregnable. It was not proposed to visit the defendant with notice of this agreement. He knew of the agreement of 1852, and relied on the failure of performance of it by the plaintiffs, to justify him in purchasing from his father. But he was not to be affected by secret agreements or equities of which he had no knowledge and no reason to suspect. On this ground the rejection was undoubtedly proper.

This was an equitable ejectment, and its purpose was to enforce the specific performance of the contract in question by enabling the plaintiffs to get possession, for the purpose of fulfilling it. It was, therefore, a case where a want of equity on part of the plaintiffs was fatal, whatever might be the result in an action in disaffirmance of it. For these reasons, what John said and did when about leaving the place, was proper to be admitted in evidence, so far as he was concerned. Indeed, it is always competent to prove

what a party says against his interest, about the matter in contro-versy.    There was, therefore, no error in the admission of such testimony.

The argument for the plaintiff in error, it seems to us, was to some extent outside of the real point of controversy.    It was not a rescission of the contract between Thomas Shirley Sr. and his sons, which was mainly involved in the contest, but whether it could, under the circumstances, be enforced against the defend-ant; and that, as suggested, depended on the equities of the case, of which we have sufficiently spoken.

We think the case was well tried, and as none of the errors assigned have been sustained, the judgment must be affirmed.